Now before you get started, before the clock starts on you, I want to make sure that we understand how you decided to allocate your time. Yes, sir. I understand there is an agreement. There is an agreement. Hopefully it will work with your honors. I will take ten minutes and reserve two. And you're going to represent? Mr. Garcia. Okay. And then my colleagues over to my left are going to each have five. Okay. And Mr. Harris, who represents Ms. Galvan, will go right after me for five minutes. Okay. Potentially with some reservation time. So you are Mr. Gonzalez? Yes. I'm sorry. I should have... All right. And Mr. Crane is for Mr. Luna? Yes. Yes. And Mr. Harris is for Mr. Galvan? Okay. Ms. Galvan. And they're each taking five minutes? Correct. Okay. But as far as the order, it will be me first discussing the trial and pre-trial issues. Mr. Harris and Ms. Galvan discussing pre-trial issues. Then we were thinking that Mr. Rhodes, for his government, would address those issues as well as his appeal of the sentence for Mr. Luna. And then after Mr. Rhodes addresses those arguments. That's right. We have a cross appeal here, don't we? All right. So let's... Okay. So let me just make sure I got this right. So we're going to have Gonzalez, Harris, then we're going to hear from Mr. Rhodes, then we're going to hear from Mr. Crane. Correct. And then we'll hear from you again? I think that's the plan. Yes. Okay. Well, that was easy. Yes. I believe the argument will be easier from this point forward. You may proceed, Your Honor. Thank you. May it please the Court, Jason Gonzalez representing the defendant, Wilford Garcia. Your Honors, there's two basic sets of issues. There are pre-trial issues and there are trial issues. And with the Court's permission, I'll address the pre-trial issues first because I think they have the most consequence. With respect to the pre-trial issues, there was a cell phone search warrant affidavit that led to this entire investigation. It was the foundation on which the investigation was built. And we submit that that was an invalid search warrant because there was an improbable cause, it wasn't a valid parole search, and that it also lacked particularity. We also have a second argument about the wiretaps, but we'll get to the cell phone warrant first because it's important to understand that it's that cell phone warrant that led to two phone numbers. And one of those two phone numbers was the first phone number used in the first wiretap. So they're sort of built upon each other. With respect to the cell phone search, that warrant was not particular in any respect. It was a state court search warrant, and it basically authorized the seizure of any electronic communications on the phone. And there were no time restrictions, no date restrictions, no individual communication restrictions, in other words, communications between my client or any of the others involved. It had no limitation whatsoever. So on its face, it was invalid. What the warrant reported to be looking for was evidence that would connect my client to the murder of two individuals, this murder having happened, or these murders having happened a few days before. So on its face, you would think that there would be a very easy way to focus that warrant on those two individuals and my client communicating with each other or anything relating to those two individuals or some time period related to when the murder happened a few weeks before. There was no limitation of that nature at all. So the other basis was Detective Wilson affidavit that when he prepared the warrant, he knew that Garcia was subject to a warrantless search. And so under Cal Penal Code, I guess I screwed up, 6-7, that it was subject to the parole search exception. Right. That's the, I think, primary argument to try to save the warrant. So a couple of responses to that. First, in the search warrant affidavit itself, the actual cell phone warrant, there's no reference whatsoever to my client being on parole. It's just not said. One would think that if that affidavit, the detective, knew that fact, he would have put it in there. But you wouldn't need a warrant under the statute. Exactly. So that begs the question as to whether he actually did know at the time that there was a search condition. Well, I mean, so the district court had the detective's affidavit, and the affidavit said he did know. And apparently the district court accepted that, and so are we reviewing for clear error? Isn't that our standard of review? What makes that clearly erroneous? I mean, you're raising other inferences. Sure. Yeah, just to make sure we're all clear, there's the cell phone affidavit, which doesn't mention any of this, any parole search, et cetera. We bring up this issue in our motion to suppress, saying there's no reference to the search condition, et cetera. So they file a short declaration in the district court to say, well, actually, he did know. Even though he didn't mention it, he did actually know. And essentially that's all he says. He doesn't say, I knew because, or I knew, I checked this, et cetera. And I would submit that that is a completely conclusory statement that's not sufficient to satisfy the burden that's set forth in the Casares case. So would we say that the district court, we would have to say, was clearly erroneous in relying on Detective Wolf's affidavit? Correct. And that's based on the inferences that you draw from the timing? Yes, for one thing. And then for the other is that the Casares case is very clear that another thing that has to be set forth is that the affidavits, who's claiming he knew of the search condition, knew that the crime that led to the search condition occurred on or after January 1, 1997. Very specific requirement, not hard to meet, but he didn't meet it. And it was clearly erroneous. Well, he says he knows that he's in the category of people who could be searched. So we would have to say under 3067, that would mean that the crime was after that date. I mean, I guess given that we're here for the clear error standard, it's like it's a little bit tough. No, I think it's my contention. That's what they're saying, basically. He wouldn't have said it unless it was true. We're saying, well, why didn't you just say it? It's a circular reasoning on their behalf. They're saying, well, he wouldn't have said it unless it was the case that it was after January 1, 1997. But the requirement is to state the simple fact. And there is no question but that that case in particular was referenced by us in our brief. It was squarely at issue. They just did not mention that. And was this argued to the district court? We tried to, yes. Okay, and the district court rejected it and credited Detective Wolf's affidavit. Right, and we would say that that's clearly erroneous. It's just a simple conclusory assertion that is contrary to the circumstances under which it was made make it highly suspect and not worthy of belief. And it doesn't specifically address the Casares requirement. So we'll move on from the search warrant affidavit. We've got several issues here to the wiretap. And again, the wiretap was based on the calls that were discovered from the search of the cell phone. And our first argument on the wiretap is that it was not sufficient, not particular at all. It does not meet the particularity requirement. And by that, I'm referring to the language in that wiretap order that basically says, I mean, it just says it can seize any communication on that phone from anyone at any time within the time period that the phone is under the wiretap. There is no limitation at all in the portion of the order talking about what is authorized to be seized and what is not. Which page of the order are you concerned with? Let's see if I can find that here. If I may have a moment, I can sit over here. It's in our Steel Excerpts of Records Volume 1. Okay, well, I've got pages. I believe the order appears on pages 84 of the SCR. I'm sorry, page 90 of the SCR. I apologize, I don't have that at hand. It's probably buried in my notes somewhere. But the provision of the order that we're talking about is where the court actually says what's authorized to be seized. And the government's response to that is to say, well, wait a minute, there are these other bits in the order that say in this sort of lead-up to the predatory language to the order that references target offenses and the goals of the investigation. So they say, look, well, the language of the actual seizure order itself might be overbought, but you have to look at the language that preceded it that said there are certain target offenses under investigation and certain goals of the investigation that this is all deriving toward. Now, I'd submit two things. First, the order itself does not, unlike all the cases that they cite and we talk about, the order itself does not reference those explicitly. It doesn't say anything, like the other ones in those other cases do. Those cases reference the above-listed statutes, etc., etc. This one does not. That's number one point. Number two point is that that predatory language, I'm calling it, the language that leads up to the order, is not explicitly referenced by the order. That language itself does not really provide much of the limitation. The target offenses, there's several that are listed, and then it just says conspiracy. But there's a footnote there that also refers to various things. It refers to the predicate offenses, aiding and abetting. Right, I guess that's another reason that it could be even broader, but I'm focusing specifically on the conspiracy reference. There's not conspiracy to commit the above-listed offenses. It's just conspiracy. That could mean essentially any federal crime. So there's no limitation for the target offenses. There's no limitation also for the goals of the investigation. There are several specific goals listed, but the sixth goal is essentially a catch-all that says evidence sufficient to convict the defendant. So, I mean, you pick out like two lines out of this order, but when you read the order as a whole, it's pretty clear that it was relating to these drug offenses. You know, in particular, like item, the sixth goal, it seems like it was a cut-and-paste error because in the affidavit it says relating to these violations. And I think we're supposed to look at the affidavit as reading it as a whole. Is that not right? And taking it in a common-sense form, I think, is normally what the Supreme Court has told us. And it's hard when you read the whole affidavit not to understand that it's relating to these drug offenses and conspiracies. Right. I think the affidavit's clearly talking about a large drug conspiracy, but the actual operative language of the order doesn't limit it in any way, and neither does the language sort of leading up to it. It provides some list, but then it says basically anything else. So is there a case that would say, because most of the cases that I looked at said you read the order as a whole and take it in the light of common sense. What's the case? Because if you pick out this language, it's general. What's the case that would say you pick out a line and if those lines are incomplete, that's enough? I would submit that the cases that are listed in ours talk about the orders themselves saying and referencing back to the specific offenses. That's what saves those orders in those cases. We don't have that here. So I think that's what we're looking at. Don't we have a number of documents here? I mean, assuming what you say is true and that the government was basically sloppy, if we look at all the documents, aren't they sufficient when all the wiretap documents are taken together? Well, I would submit that they're not, number one, and then for the reasons I've discussed. And then number two, I think it's a bad precedent to follow or policy or however you want to refer to it because of the intrusive nature of a wiretap. The fact that the wiretap is being administered basically by civilians. They're listening to the calls and maybe they're minimizing, maybe they're not. But if the instruction from the courts are, here or elsewhere, that, well, there's a stack of paper. You read it all. You figure out what you think is feasible. That's not a good rule. A good rule is to say, look at what the order says. The order says seize calls related to these specific offenses. It's pretty broad in and of itself, and I'm willing to grant that that can be broad because nobody knows exactly how the calls are going to be, what they're going to be discussing exactly. So you give them a lot. I'm not trying to propose a complicated, difficult rule. The rule is easy. Just specify the offenses, and they didn't do that. And that's why I think if you just give someone a stack of paper and say, if you read all this stuff together, it suggests that they're looking at this and not at that, and that's enough to specify what you should seize and what you shouldn't. I realize I'm over my time, and I know we have several other people that wish to speak. I'm happy to address further questions, but I feel that I should step aside. We'll come back if we have additional questions. Thank you. Good morning. I'd like to say a few words about the United States v. Leon good faith exception on the wiretap suppression motion in the event the court reaches that issue. This is an area of the law that is, in my opinion, sorely in need of clarification, both in this circuit and nationally. Title 18 U.S.C. section 2515 states the remedy for a Title III violation, and the remedy provided by Congress, pure and simple, is suppression. There is no, in 2515, there is no exception for good faith or harmless error or anything else. It's just straight suppression. That's what Congress said. In this case, I'd ask the court to look at the, in the event you reach this issue, look at the statutory language, look at the Rice case from the Sixth Circuit that I cited. It goes into great detail why the Leon good faith exception should not apply to Title III violations. Turning to the law of this circuit, I would submit that there is no law on this point. We've cited the United States v. Reed case, and in that case, the statement by that panel was simply that the good faith exception would apply. The next preceding sentence states the holding, and parenthetically, they just in pure dictum said, this will apply, would apply if we reach the issue. And that Reed case relied on United States v. Butts, an earlier case, which was not a, it wasn't even a Title III case. That had to do with state pin registers and wires. So, there's no law in this circuit that the Leon good faith exception does or does not apply. I can tell the court that this is an issue that comes up in many wiretap RICO cases. We see that all the time, and you know, both sides argue it, and there's dictum both ways. It's an area of the law that needs clarification. There's a circuit split, as stated in the Rice case, between the 6th circuit on the one hand, and the 8th and 11th circuit on the other hand. So, I just submit to the court, it's an area of the law that comes up all the time, it needs clarification, and in the case that the court reaches this issue, I would ask for some clarification on this point of the law. So, unless the court has any questions, I'll submit it. Okay, thank you. Mr. Rhodes, because the government has a cross-appeal, you checked that it would be entitled to some rebuttal, but it would be limited to the government's appeal. Your Honor, I hope to address it all in my 20 minutes. Okay, all right. Good morning, may it please the court. Justin Rhodes on behalf of the United States. I'll begin addressing the issues in the order they've been presented, and then I'll address some of the issues that Mr. Gonzales did not get to, which I'm sure the court may have some questions about. To start off, the cell phone search, and whether or not it was particular. I think, obviously, this court can uphold the search of the cell phone on either the basis the district court did, which is the plural search, or independently because it was a sufficient search warrant affidavit and application. Well, counsel, as you get into that, let me just ask, can you explain the discrepancy between the goals of the investigation as listed in the wiretap application, and the goals of the investigation as listed in the wiretap order? Was the discrepancy intentional? I'm sure it was not, Your Honor. Is there a specific reference that you're referring to? I'm sorry, I don't have that at the front of my mind. What are we supposed to do with that? Because on its face, there clearly is a big discrepancy there. Is there a reference, Your Honor, that I can track to quickly? I'd like to resolve the discrepancy. All right. Well, go ahead with your other argument. That's a question in my mind. I understand. I will focus on that as well. As to the particularity of the cell phone search, what the affidavit said was, we need to look at the stored communications within this device. And I think it's fair to say that it was hard at that point in the investigation, three days after a double murder, to know exactly what it was that could or couldn't implicate Garcia. And I think to say that it is only as to those two victims takes out a lot of evidence. If Garcia was communicating with other members of his gang to coordinate this murder, or if he said specifically, hey, I committed the murder, but I didn't reference either of the two victims, then under Mr. Gonzalez's reading, that couldn't be seized. Similarly, a date restriction I submit to you wouldn't be helpful either. If Mr. Garcia, if the phone was helpful in pinpointing Mr. Garcia's location, and that happened to be near the location of the murders, yes, that is great evidence as to the day of the murder, but if he went there every Thursday for six weeks before that, that's also exculpatory as to Mr. Garcia's travel patterns. And so to say as to these two victims, as to those two days, is too limited. I would also point out that the cell phone, the affidavit, did not ask for Facebook posts, photos, videos. It's not the entire content of the phone. Counsel, the application is under supplemental excessive record for 14, and the order is supplemental excessive record 90. And I noticed that one of the target offenses listed in the wiretap application affidavit and order is a general conspiracy offense. And again, the question was the omission of the object of the conspiracy intentional. It was not, Your Honor, but I believe that you could read that to relate to the drug trafficking offenses that are referenced there, and that read in context of all the other crimes that that is what that's referring to. But except for number five, which was unlawful possession of firearms, all of the other crimes were conspiracies. You're not going to have a conspiracy to conduct conspiracies. That's correct, Your Honor. Perhaps it could have been more specific in that regard. I give you that. Well, I mentioned sloppy. I probably shouldn't have used that word, but I really meant to say that the government could have done a better job with these records. I understand, Your Honor. All right. Briefly touch on the parole exception. I think Mr. Gonzalez reads too much into the Cazares case. Cazares does not say you must know on what date and for what crime a defendant was convicted. The case says that that is a way of knowing what it is, why it is that you can search the person. Detective Wolf said unequivocally, I knew that Wilfred Garcia was on California state parole and subject to search conditions. How did he know that? That's not in the record, Your Honor. And frankly, perhaps the declaration could have said more. But I think that is the operative fact, the basic fact, to use Mr. Gonzalez's words. Did Garcia consent to the search? He did. That was the search of the car, right? He admitted that he was subject to search and that he voluntarily turned over his phones. Does that mean that he consented to the search of the phones? He did, and we haven't argued that in our brief. But I think that is something the court can consider, certainly if you want to take another step to look at the good faith, that there are a number of reasons why Detective Wolf's search warrant could be upheld, certainly on its face, but also under good faith. The purpose of the warrant, as he declared, was to get the phones from the custody of a different law enforcement organization, and that was why it was needed. But nonetheless, he says, I knew Garcia was subject to search conditions, and I don't think there's any dispute that that's not the case. As to the particularity, what I think that the defense arguments miss on this point is how a wiretap interception occurs. You have an order that allows you to listen to or monitor all of the calls of a specific facility for 30 days. Now a computer obviously doesn't do that recording. You have a human being sitting in a wiretap room listening to the calls, and until you actually hear the call, you don't know whether it's about Coca-Cola or cocaine, heroin or hairspray. And so you need an order that says here are the crimes under investigation, here are the goals of the investigation, and then what it says, and this is something that they really don't talk about, is there's a minimization requirement, which is don't listen to calls that don't relate to this investigation. And by skipping over all of that, they ask this court to look at it piecemeal and say, well, there's a whereas clause, a wherefore clause, but if you read it as a whole, what it says is here's what we're investigating, here are the target subjects, and there's no dispute that it meets the requirements of the statute in identifying the crimes under investigation and the persons who are committing them. And then it says the communications to be intercepted will relate to the goals of the investigation, and then it says don't intercept communications that are not authorized to be intercepted. And so without that clause becomes purely surplusage, which is the active listening part of what the agents were supposed to do. And so without talking about minimization, I think they overlook a lot of the cohesiveness of that order. I'll touch very briefly on Mr. Harris' arguments about the Leon good faith as to wiretaps. I don't think the court needed to reach that. I think there was certainly probable cause and necessities for these warrants. Does the government have a position on that question? I acknowledge that the Ninth Circuit has not spoken. There are two circuits, I believe it's the Eighth and the Eleventh, that say yes, it does apply. One circuit, the Sixth Circuit, which is the Rice case, says it doesn't. The Ninth Circuit cases that I've read and cited seem to suggest that it would here, but there is nothing hard about that. Does the United States have a formal position? Has Maine Justice taken or the Solicitor General taken a position on this case? Not that I'm aware of, Your Honor. So covering those arguments, I'd like to move into the other arguments that were raised that I'm sure you may have questions about. As to the jury instructions, I think first of all, on the multiple conspiracy instruction, I think there was just no basis for that. All of the evidence came in that Mr. Garcia was in the middle of this conspiracy. He knew top to bottom. He knew Mr. Albert Lopez, who was number one in the conspiracy. He knew Mr. Del Valle, who was the central hub in the conspiracy. And then Mr. Garcia had his own people to whom he redistributed. He also separately obtained drugs from Kenny Montoya, who was another of the sort of mid-level, maybe a secondary hub, if you will. So the evidence was that this was the conspiracy that was charged, and there were not evidence... The cases about multiple conspiracies really deal with where there's one defendant who has deals with A, and the same defendant who has deals with B, and A and B have nothing to do with each other. Here, Garcia was talking about the other people. He was talking about referring customers, or Yancey Montoya referring customers to him. It was all part of a greater scheme. So thus, it was proper for the district court not to use the multiple conspiracy instruction. As to the accomplice jury instruction, I submit to you that the instructions that were given by the court track almost exactly the language that Mr. Garcia asked for. If you look at WGER 164 to 165, the district court said to the jurors, you should carefully scrutinize all of the testimony given, consider the circumstances under which each witness testifies, and everything in evidence which tends to indicate a witness is worthy of belief. A little bit later, the judge then said, consider the status of a witness. If a witness is an informant for the government, or an accomplice or participant in the commission of a crime charged, you should use such testimony cautiously and weigh its probative value with great care. But what happens when you add that to the vouching problem? That's fair. Are you talking about the both of those together? Well, can I address vouching first and then talk about the collective? All right. So just to finish that thought, the only thing that Mr. Garcia's instruction would have added is, Arthur DelValle is the accomplice. And I think that was a ground that was trod on throughout the entire trial, and so there was no question of who the accomplice was. So it was proper then for the district court not to give that instruction. Going to vouching, certainly if I was able to take back those two sentences, I would. I do believe they were improper. And the fact that they, I submit to you, were an invited reply does not make them proper. Nonetheless, I do think they came in the context of a trial  And in Mr. Gonzalez's closing, he was called a lying used car salesman. And thus I said the two sentences that shouldn't have been uttered. Having said that, and I think this distinguishes this case from a lot of others, I immediately recognized it and corrected it, or attempted to correct it to the best of my ability, and left, in my attempts, the jury with the impression that credibility is solely your responsibility, and that give, I think I used the words, give Mr. Duvalier's testimony as many grains of salt as you feel is appropriate. Now, and again I'm going to close vouching, and then we'll talk about the collective-ness of it. The cases, and I think Sarkeesian, I think Stinson, and I think even Nicochea, all weigh in favor of finding that this was a harmless error. And the reason why is it was a small amount of vouching. Again, not that an invited reply makes it okay, but oftentimes this court has said, acknowledged that sometimes that happens. And then what I really think that the strongest argument for harmless error here is the overwhelming amount of evidence that the government had against Mr. Garcia that did not require Mr. Duvalier's testimony. And those are the words of Mr. Garcia himself. The government had numerous wiretaps, as we've discussed. One of those wiretaps was on Mr. Duvalier's phone, and another one was actually on Mr. Garcia's phone. So not only do we have Mr. Duvalier talking to Mr. Garcia on the phone about the very same things that Mr. Duvalier had testified about, but we have Mr. Garcia talking to people entirely separate, people about whom Mr. Duvalier never testified. And some of those things that Mr. Garcia says, when he's talking to Mr. Duvalier, he asked to order an eight. As the detective testified, that's an eight ball, that's an eighth of an ounce of methamphetamine. He talks about how he owes $400 to another person who's a drug supplier. He says he wanted to weigh out the work. Work is a common parlance, as Detective Fleming testified, to talk about methamphetamine, before he gave more of it to his girlfriend for her to sell it.  He asked how much he should charge for an eight ball on the street. And then there was a discussion about whether they're a heavy user or a tweaker or a light user, and what the current prices should be. He then says that he has 5.5 grams that he needs to get rid of. These are all calls that are in excerpts of record. Mr. Garcia's starting at about 5.56 and going through about 6.97.  He then tells Albert Lopez, the Mexican Mafia connected leader of the conspiracy, that he's going to have to go back and start selling drugs again, that he used to have someone else do it for him, but he's going to have to do it himself. He then talks to Yancy Montoya, who says, I'm going out of town for a little while, here, take one of my customers. He buys two or three times a week, and you can sell to him. I don't want to interrupt you, but I don't want your time to run out. I would like very much for you to comment on the necessity for the wiretap before your time runs out. Yes, Your Honor. And how you distinguish the Gonzales case. Distinguish the Gonzales case? Yes. Okay. On necessity. On necessity, yes. Gonzales, I think, one of the things that I think makes Gonzales different is that it hasn't had a Franks component, that there were discussions of material misrepresentations in the affidavit. And while that doesn't necessarily go to necessity, I do believe that weighs into consideration. But in Gonzales, as Your Honor is well aware, the government only used pen registers. They did five days of surveillance, and they made a sort of unspecified attempt to infiltrate the conspiracy. Here, what I think is important to note is that none of the defendants have been able to identify a method that wasn't either employed or rejected as unsafe or impractical. So it's not that there's a specific approach that's in the universe of law enforcement tools that Detective Fleming didn't consider. Now, what he did do, though, I submit to you is it was quite extensive. And it may not be for as long as the defense counsel would like, but there is no specific length that counts. No. Well, there was two months here, although it's unclear what actually happened in April besides review of six months of jail call records. The main activities, as I understand the records, took place in May consisted of 10 days of total analysis on one phone number, at least three instances of physical surveillance. The affidavit says there was no GPS tracking because they didn't have the cell phone number. But it does explain why the government didn't track Montoya, a target subject's phone, whose number is listed in the affidavit. And there is no attempt to use the confidential informant number three despite having one readily available because it was anticipated he would only have information on one target subject. So none of those things were done before the wiretap took place. Well, Your Honor, I think we can take them individually. GPS tracking, I don't think it was Mr. Montoya's car. I don't think they felt that they should go put a tracker on his car if it wasn't really his. They also listened to jail calls leading up, and they explained why jail calls only give you half the conversation or give you half of a participant who is capable of surveillance, and you can't act immediately. If they say there's a drug deal going down, you don't get the jail call until a day later or two days later. The surveillance, I think, established that there was something happening in the Albayarre residence, but they couldn't get in and see it. They decided that searching it would be inappropriate because then the game is up. And as to the confidential informants, I think that there's a little bit of Monday morning quarterbacking going on from the defense argument. You talk about CI3, but I think CI1 was in custody facing a federal indictment. CI2 was in a drug program, and pulling someone from a drug program is not going to be your best witness. And CI3, yes, could provide information, but also said that he or she was unlikely to testify, so that if you're building a case from the ground up, you don't want to start with an informant who's never going to testify. Why can't you interview people who are in custody? CI1. You can interview them, but they can't provide you information. Also, CI1 was likely the subject of a federal indictment pending, so you wouldn't want to use that person and then charge them in a separate indictment. CI2? CI2 was in a six-week drug program, and pulling that person out, Detective Fleming decided it wasn't practical or reasonable under the circumstances. So let's go back to the collective issue of the vouching and the jury instruction. I think the Novari case identifies three somewhat significant problems with the trial there, but then came back around and said, in light of, in large part, the strength of the government's case, those issues collectively did not constitute or were harmless error and didn't suggest reversal. And so I think if you look at that case, I think that's very similar here. I'll talk briefly about the sentencing. I see I have about a minute and a half left. I don't think there's any basis to follow the arguments of Mr. Luna or Mr. Gonzales. I think the mandatory minimums are well established. I think Wipf and Iabez established that. There was no forfeiture or waiver of the government's right to now challenge on appeal. All of the parties, including the probation office, went into the sentencing hearing saying the mandatory minimum applies. The district court judge acknowledged in both sentencings that there is a mandatory minimum, then decided to impose a sentence below that, and then the hearing was concluded. And so I think that to Mr. Rodriguez's case, which is out of district, I acknowledge, says that at that point it would be essentially fruitless to force the government to lodge an objection. And that should the court decide that the government did forfeit the right and that we then go to a plain error standard, I would submit that the error is clear under current law and that it does affect substantial rights. And there are cases holding that the government shouldn't be heard to come back and complain about a sentence if it didn't immediately object. Those cases generally, though, where the difference was small in the 10% range, here it was a 40% reduction for Mr. Luna and an approximately 60% reduction from the guidelines for Gonzales. And I think there are substantial cases showing that that does affect substantial government rights and the government should be permitted to carry that appeal. Unless there are further questions, I would submit. Thank you, Mr. Rhodes. Good morning. May it please the court. I'm Michael Crane on behalf of Raymond Luna. Your Honor, what happened in this case at sentencing, and I'm just going to limit my argument to sentencing, and I'd like to address the following points. Unless the court has some questions about WIPF, we have an argument in the brief about why WIPF did not answer all the questions as to why 3551 does not control in this case as opposed to 846. But in view of the limited amount of time, I'd rather spend it if the court pleases on waiver and forfeiture. So at the time of sentencing, the district court judge considered 3553, and he issued a 36-month sentence. And the government says again and again in its briefs that, well, we didn't have an opportunity to do anything. There's no evidence at all in the record, in the plea, excuse me, in the sentencing transcript, that that took place. There's nothing to show that. There's no reason that the government shouldn't have objected at that point. Exactly. Okay. So let's just go straight to plain error. So why isn't this just plain error? Well, first of all, we have a waiver argument because I don't think you can say that it may be, circumstantially, that the government intended this. Well, that's how we usually get to plain error, is that somebody has forfeited it rather than waived it. A waiver, distinct from a forfeiture, is a conscious decision to do away with it. I don't see that there's anything conscious here. Well, there may have been, and for this reason. The court may have – I don't know. I mean, I'm not a mind reader, and I think we can only go on what the appellate record is. But the fact is – Can the government even waive that if it's part of the statute? I think the government can waive it. There are cases that we cited, Tello and Felix. Again, well, in fact, I agree. Well, the government's not on the record stating that it waives that. So let's just assume that they forfeited it by failing to object. So looking at plain error, why isn't the error plain here? So all the parties agreed that there was a five-year mandatory minimum. The district court disagreed and gave some reasons, which it stated on the record, and that was the end. So why isn't that a plain error in light of our decisions? Well, if it's not a waiver, then we turn to forfeiture, and the question becomes is it plain error, and if so, did it affect the government's substantial rights? So if you go to the question as to whether it's error, it's pretty clearly error. It's a plain error. It's error unless it's waived. Okay. Because under Olano, they can't appeal a waiver, but if the court doesn't think there's a waiver and wants to address the forfeiture, I'll go straight to that. And so if WIPP controls this panel, I don't think it does, because there are instances in a footnote, page 15 is a footnote in one of our briefs, showing why 841 has other specific directions that say that despite any other provision of law, which would include 3553, the court can't do certain things. But be that as it may, if WIPP is controlling, then the court erred. And was it plain? I don't think that's the real issue here. I think the real issue here is whether it substantially affected the government's rights, and there are cases saying that it doesn't. And one of them, which I apologize for only filing a letter of additional authority with the court clerk yesterday, is a case right out of this circuit, which is, and I may be mispronouncing it, is United States v. Veek. And that case did not involve a mandatory minimum, but it did do two things. One, it concluded that even if the sentencing error by the district court violated, or was plain error rather, that it was going to disregard the fact that it affected the government's substantial rights. And it's cited directly to a case that did involve the court issuing a below mandatory minimum sentence out of another circuit, which we cited, Garcia-Piardo. So this circuit has cited with approval a case out of another circuit in which the district court gave a below mandatory minimum sentence, and the government forfeited its claim by not objecting in the district court. It's a basic long-time rule in the law that if you've got an objection, no matter which side you're on, you've got to object. You've got to preserve your record. But that's why we also have the plain error doctrine. Well, yes. So there's a split of authority among the circuits as to whether the court imposing an improper sentence constitutes substantial, substantially affects the government's rights. There's a split of authority in the circuit. But the case that we cited yesterday, Vick, or Veek, says that even if it affects substantial rights, this court, the Ninth Circuit, decided to do exactly what the Supreme Court said in Olano it could do, which would be that even if it affects substantial rights, we're not going to do anything about it. We're going to let the sentence stand. I mean, as the record shows, he's here today, Mr. Luna. He was released from the BOP because of the district court sentence. He served his time. He was released in July and has gone on about his life. So I think the court has full authority under existing law, under precedent from the Ninth Circuit, to say that, one, it didn't affect substantial rights, and if it did, the government should have done something about it and let the district court deal with it in the first instance, which is the way the law normally requires litigants to conduct themselves at the trial level. What do you do with the statement of the government that the district judge imposed a sentence and immediately adjourned the court and walked off the bench? I think, first of all, any experienced attorney, as counsel for the government here is, would say, excuse me, Your Honor, there's something I'd like to address to the court. If the court continues to walk into chambers, at least you've tried to make your record. Here, there's no evidence that the judge walked off the bench. There's no evidence that the government was bound and gagged. There's nothing in the record to show why the government couldn't speak up and say, excuse me, Your Honor, the court has just given a sentence that we contend is illegal. I had the opportunity to thank the court, which shows on the record. So apparently the court was, the judge was still there and could hear that. I can see what you think the court is. Well, I don't try to be polite. Thank you, Mr. Crane. We've taken you over your time. Thank you, Your Honor. Mr. Gonzalez? Thank you, Your Honor, and I'll be brief. I just have a few points to make to address some of the things that government counsel discussed. First on the wiretap, counsel referenced the minimization portion of the order as saving the overbroad part of the wiretap order that just says seize everything. That portion, that minimization portion, is on our supplemental excerpts of record, page 100, and that says that the interception shall be conducted to minimize interception of communications not otherwise subject to interception pursuant to the order. So it basically just refers back to the order's seizing language, right? What's subject to interception pursuant to the order? Well, minimize if it's not subject to interception. How do you know if it's subject to interception? You look at the interception language. It says seize everything. So that doesn't save the argument. Okay, where does it say seize everything? That is SCR 94. Okay, and which one? Bottom of the page, paragraph number one, law enforcement agencies are authorized to intercept wire communications, et cetera, in the vicinity of the target telephone number one or coming from target telephone number one. That's just the general authorization. That's the wiretap authorization. Exactly. That's my point. It's extremely broad. Yes, but you have to read the rest of the order, counsel, not just that paragraph that says, yes, we're going to have a wiretap. Well, that is the portion of the order that says, if you look right above that paragraph, so back on page 94, it says wherefore. If I ordered that, you were going to seize everything, essentially. I'm paraphrasing, obviously, but all this language that we're talking about where there's the target offenses and the goals of the investigation, that's in the language leading up to this. When you get to this, this is where all the action is. What do you get to seize? Well, you get to seize basically every communication in the phone. And I understand their points. I just want to address the specific point they brought up. First of all, I think we should frame the argument in terms of the order itself is extremely broad. It's as broad as you can get. That's how this is all framed. And then you look, okay, well, is there a way to save it? The ways they say to save it, I think, are not valid. Minimization, for the reasons I just described, it just refers back to the seizing language. The target offenses includes conspiracy, period. Then what about the goals of the investigation? That says basically you get evidence to convict them. So those things, first of all, maybe those other things are typos. But the order itself is overbroad. And every single wiretap order in this case has that same blanket authorization. And so that's how we should frame this. And I don't know that it's proper to sort of cut some slack on that when the order itself, which is repeated throughout this case, is itself extremely overbroad. So I'm sorry, that was my first point. I don't want to take too much time. On the accomplice instruction and the vouching, I would just remind the court that those instructions, the only instructions about credibility, et cetera, were before any of the evidence was presented. The accomplice instruction, I disagree with my adversary. The accomplice instruction that we proposed said, view Mr. Del Valle, the cooperator's testimony, with greater suspicion than anyone else. That was not said. Great suspicion was said, but just getting that out there. We say greater suspicion than anyone else. We say, don't view Mr. Del Valle's plea agreements as evidence of guilt. That's not mentioned in the instruction. That's forgiven. And then we say, consider the benefits and whether they would affect Mr. Del Valle's testimony. So there is a difference. If you look at the words, compare them, and we lay that out in our reply brief. And then the vouching itself, we made the objection right away. It was not corrected by the court. Mr. Rhodes, I certainly agree that it was not an intentional bad act on his part. And I commend him for attempting to respond right on the spot. The response, however, was not a disavowal like I would submit was appropriate, either by the court or by Mr. Rhodes. Disavowal being something along the lines of, forget what I just said. I should not have said that, something like that. That's what was considered in the Simtope case and was not considered to be sufficient, even when the court gave it. So I would submit, although I commend him for making the effort, that it was not sufficient. Third, and second to the last point, with respect to the overwhelming evidence that they claim that there is, that establishes its harmless error, I would say that Mr. Devaya is the only person that had any eyes on Mr. Garcia doing anything improper. Just draw the court's attention to the fact that there was no evidence that Mr. Garcia was seized with any drugs in his house, was seen doing any hand-to-hand sort of transactions, etc. The only thing they have is this transaction a year earlier where the deputy that arrested him in November 2009 said, well, that's not related to this investigation. That's all they have. Then they have Mr. Valdez's search warrant after the fact, about a year after any of the calls related to Mr. Garcia. They try to attribute it to Mr. Garcia. So Mr. Devaya's importance is that he's the only witness that says, I saw Mr. Garcia do something wrong. Nobody else says that. Last point, and I appreciate the indulgence. On necessity, our point I guess is sort of twofold. They didn't give us very much time at all, whether it's one month or two months, whatever you call it. That's not a whole lot of time if you're investigating a 170-member gang. They also didn't do a whole lot in those two months, I would say, I would submit. They had three instances of surveillance, and looking at 11 days' worth of phone calls, looking at 11 days' worth of phone calls, maybe that took three hours, I don't know. That wouldn't take very long to do. And doing a mail cover. The one thing they did do that was sort of different and unusual is they had access to jail calls. And I would submit that those things are very useful, and they were yielding results, as is all over the record. They charged two of those jail calls in their indictment. And I would say that if you hear a conversation about a drug deal, it doesn't mean that it's necessarily in the past. They could be, and I believe they were in some of the calls, plotting future things. So if you're able to monitor these things, you could go out and say, well, we're going to monitor this person that's not in jail to discuss the transaction and see if they do, in fact, do a transaction or do other transactions. It's not that difficult. They just, in my opinion, they just made a perfunctory effort to do an investigation, and their first major step was to get a wiretap. And that's not permissible under this court's law. Thank you. Thank you, Mr. Gonzales. We thank all counsel for a very helpful argument in obviously a substantial case. With that, we've completed our oral argument calendar for the day. That concludes Judge Nelson's service with us for the week. So the court stands adjourned until tomorrow.
judges: Nelson, Bybee, Ikuta